| United States District Court | DISTRICT<br>Eastern District of Pennsylvania | |
|---|---|---|
| UNITED STATES OF AMERICA<br>v.<br>BASIL BERRY | DOCKET NO. | |
| | MAGISTRATE'S CASE NO.<br>13-209 | |

Complaint for violation of Title 21 United States Code §§ 846, 841(a)(1)

| NAME OF JUDGE OR MAGISTRATE<br>Honorable Lynne A. Sitarski | OFFICIAL TITLE<br>U.S. Magistrate Judge | LOCATION<br>Philadelphia, PA |
|---|---|---|
| DATE OF OFFENSE<br>February 14, 2013 | PLACE OF OFFENSE<br>Philadelphia, Pennsylvania | ADDRESS OF ACCUSED (if known) |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

On or about February 14, 2013, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant Basil Berry knowingly and intentionally attempted to possess 500 or more grams of cocaine, a Schedule II controlled substance, with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

SEE AFFIDAVIT ATTACHED HERETO AND INCORPORATED BY REFERENCE.

MATERIAL WITNESSES IN RELATION AGAINST THE ACCUSED:

Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge.

SIGNATURE OF COMPLAINANT (official title)
MATT GORDON
OFFICIAL TITLE
SPECIAL AGENT, DEA

Sworn to before me and subscribed in my presence.

SIGNATURE OF MAGISTRATE (1)
Honorable LYNNE A. SITARSKI, United States Magistrate Judge

DATE
2/15/2013

1) See Federal Rules of Criminal Procedure rules 3 and 54.

## AFFIDAVIT

I, Matt Gordon, being duly sworn, do hereby depose and say:

## INTRODUCTION

1. I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed for approximately seventeen years. Prior to employment with the DEA, I was a Special Agent with the Immigration and Naturalization Service for approximately seven and a half years. I have been employed for approximately twenty-four years as a law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code. Since July 2007, I have been assigned to the DEA Philadelphia Field Division, Financial Investigative Group ("FIG"). I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code, and I am empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. I have participated in the investigations involving the unlawful importation and distribution of controlled substances in violation of Title 21, United States Code, Sections 812, 841, 846, 952, 959, and 963 and the laundering of the proceeds from those offenses in violation of Title 18, United States Code, Sections 1956 and 1957. I have specialized training and experience in drug smuggling and distribution, but also in money laundering investigations including, but not limited to, the means and methods used by drug traffickers to import and distribute drugs and the means and methods money laundering operators utilize to launder and conceal drug proceeds. I am aware of the circumstances of this case and I am personally involved in the investigation of the facts contained in this affidavit.

2. I submit this affidavit in support of arrest warrant and criminal complaint charging Basil Berry with attempted possession of 500 grams or more of cocaine with intent to

distribute, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

3. The information contained in this affidavit is based upon my personal knowledge and observations, the observations and personal knowledge of other law enforcement officers and information provided to law enforcement officers. Because this affidavit is submitted for the limited purpose of establishing probable cause to obtain an arrest warrant, it does not set forth each and every fact learned by me or other agents in the course of this investigation. Where conversations are related herein, they are related in substance and in part only.

## PROBABLE CAUSE

4. In August 2012, DEA Agents received information from a DEA Confidential Source ("CS"), who has provided reliable information in the past, that Basil Berry was involved in laundering drug proceeds and also distributing kilogram-quantities of cocaine and hundred-pound quantities of marijuana. The CS also informed DEA Agents that he/she met Berry and several unidentified co-conspirators in Brooklyn, New York in the middle of August 2012. During this meeting, Berry told the CS that he distributed multiple pound quantities of marijuana in New York and Philadelphia and wanted to purchase approximately 10 to 15 kilograms of cocaine. The CS told Berry and the other unidentified co-conspirators that he/she knew a Source of Supply ("SOS") for cocaine in Philadelphia who also installs concealed compartments in vehicles. The CS, through several unrecorded telephone calls with Berry, arranged to introduce Berry to the SOS for cocaine in Philadelphia. Berry agreed to meet the CS on August 22, 2012. The purpose of this meeting was to introduce Berry to Task Force Officer ("TFO") Al Galarza (herein after referred to as "TFO Galarza"), who was acting in an undercover capacity as a cocaine SOS and as a person who can install concealed compartments in vehicles.

5. On August 22, 2012, TFO Galarza and the CS met with Berry at Darling's Diner, located at 1033 N. 2nd Street, Philadelphia, PA. TFO Galarza was posing as the cocaine SOS and as a person who could pick up bulk cash and launder the proceeds. During this meeting,

2

TFO Galarza asked Berry if he needed his drug proceeds laundered. Berry said he did not because he had his own method to launder drug proceeds. However, Berry told TFO Galarza that he needed a SOS for cocaine. TFO Galarza told Berry that he distributes no less than 10 kilograms of cocaine to customers. Berry asked TFO Galarza if TFO Galarza could distribute five kilograms of cocaine to him if he (Berry) agreed to have TFO Galarza install a concealed compartment in his vehicle. In my training and experience, it is common for drug traffickers to transport drugs, firearms, illegal proceeds, and other contraband in hidden "after market" compartments of their motor vehicles to have ready access to these items as well as to evade detection by law enforcement officers.

6. TFO Galarza told Berry that he would consider it and told him that the cost to install the concealed compartment was $4,000. Berry told TFO Galarza that he wanted the concealed compartment installed in his Toyota Sienna. Berry then added that he would purchase 10 kilograms of cocaine from him, but he first wanted to start with purchasing five kilograms of cocaine.

7. On September 12, 2012, the CS met with Berry and two other unindicted co-conspirators at the Sugar House Casino parking lot, located at 1001 N. Delaware Avenue, Philadelphia, PA. This meeting was arranged by through several unrecorded telephone calls and text messages between the CS and an unidentified co-conspirator ("herein after referred to UCC #1"). Previously, UCC #1 had told the CS that Berry wanted to know when he could purchase five kilograms of cocaine from TFO Galarza. The CS told UCC #1 that he/she wanted to meet with Berry in Philadelphia to further discuss the purchase of the cocaine. UCC #1 agreed and told the CS that he would contact Berry. The CS and UCC #1 agreed that they would meet on September 12, 2012. On that day, law enforcement officers observed Berry and two unindicted co-conspirators arrive in a white Acura. The CS asked Berry and the two unindicted co-conspirators about the difference between the "girls in Philly and the girls in New York." The

3

CS told Berry that TFO Galarza liked him, but said to Berry that "you told him that you want five. . . . That killed me. I told him fifteen to twenty. Who is lying? I'm not lying. We need to work things out." Based upon my training, experience, and involvement in the investigation, I believe that when the CS was referring to the difference between "the girls" in Philadelphia and New York, he was asking about the difference between the cocaine in Philadelphia and in New York. In addition, when the CS said that Berry "killed him," the CS was explaining that Berry had damaged the CS's credibility with the SOS (TFO Galarza) because Berry had originally said to the CS that he wanted 15 to 20 kilograms of cocaine, but then told TFO Galarza during the August 22, 2012 meeting that he only wanted five kilograms of cocaine.

8. The CS then asked Berry, "Teach how much are you willing to take?" Based upon my training, experience, and knowledge of this investigation, I believe that the CS was asking Berry how many kilograms of cocaine that Berry wanted. And based upon my debriefings with the CS, I know that the CS referred to Berry as "Teach." Berry replied that he had to "look into it" and then spoke to his co-conspirator in a Jamaican Patios dialect, and was overheard saying "twenty."

9. The CS told Berry and his co-conspirator that the CS wanted to start with the concealed compartment and asked them if they were ready to get a vehicle with a concealed compartment. Berry replied "yes, one stash car." Based upon my training, experience, and knowledge of this investigation, I believe that Berry confirmed that he wanted a concealed compartment installed in the Toyota Sienna.

10. On October 11, 2012, the CS met with Berry at the Sugar House Casino parking lot, located at 1001 N. Delaware Avenue, Philadelphia, PA. Law enforcement officers observed Berry arrive in a blue four door Honda. While meeting with Berry, the CS called TFO Galarza and gave the telephone to Berry. TFO Galarza told Berry that he would distribute kilograms of cocaine with him after the concealed compartment was installed in Berry's vehicle. Berry told

4

TFO Galarza, "I'm ready whenever you are ready." After Berry finished talking to TFO Galarza, Berry asked the CS when they wanted "to take care of the car thing." Based upon my training, experience, and knowledge of the investigation, I believe that Berry was asking the CS when TFO Galarza would install the concealed compartment in the Toyota Sienna. The CS replied next week.

11. During the same meeting, Berry wanted to know if he could receive kilogram quantities of cocaine if he knew a customer who wanted to purchase it. Before the CS could respond, Berry asked, "do I have to wait for the car?" The CS replied yes. Based upon my training, experience, and involvement in the investigation, I believe that Berry asked if he had to wait until the concealed compartment was installed in his vehicle to receive kilogram quantities of cocaine from TFO Galarza. Berry asked for the price to install the concealed compartment. The CS said $4,000, of which $2,000 was due immediately and $2,000 after the Toyota Sienna was delivered with the concealed compartment installed.

12. Berry then told the CS that "the weed thing" is thing he knows. Based upon my training, experience, and involvement in the investigation, I believe that Berry stated he distributed marijuana. Berry asked the CS to inquire about the price for the marijuana in McAllen, Texas. I also know, from my experience and training, that the McAllen, Texas area is a popular origination point for controlled substances. Berry and the CS then discussed the varying prices for a pound of marijuana. The CS said "six hundred, five seventy five" for the "really green." Based upon my training, experience, and involvement in the investigation, I believe the CS said the price per pound for marijuana was $575 to $600. Berry asked the CS how much he had to pay "here" if "they want five seventy five." Based upon my training, experience, and involvement in the investigation, I believe Berry wanted to know the price he had to pay in the Philadelphia area if the source of supply charged $575.00 per pound in Texas. The CS said he/she didn't know.

5

13. The CS told Berry that he had to get the "money down there." Berry replied, "I have ways to get the money there." Berry wanted the CS to coordinate transporting the "good popcorn" from McAllen, Texas and wanted "twenty-five first." Berry then started to shout out numbers and amounts "twenty-five," "three fifty," "one hundred, two hundred, three hundred," and then said "I will have somebody take the money down there." Based upon my training, experience, and involvement in the investigation, I believe that Berry was explaining that he had the means and method to deliver money to Texas to purchase 25 to 300 pounds of marijuana. Finally, Berry told the CS "I have a guy down there in McAllen, a good guy. I have guys everywhere." Based upon my training, experience, and involvement in the investigation, I believe that Berry was saying that he had a marijuana source of supply in McAllen, Texas and had numerous sources of supply of marijuana throughout the United States.

14. From October 24, 2012, to October 26, 2012, the CS arranged to meet Berry in Philadelphia, PA. This meeting was coordinated by the CS through several recorded and unrecorded telephone calls and text messages with Berry. In those communications, Berry agreed to meet the CS, deliver the Toyota Sienna, and bring $2,000 in cash as payment for the concealed compartment to be installed in the Toyota Sienna. In one of the unrecorded telephone calls, the CS, in the presence of your affiant, told Berry that he/she could meet in 35 minutes and that "Al took care of the two," referring to TFO Galarza. At first, Berry was a little confused, but the CS explained that the total price was $4,000 to install the concealed compartment, but TFO Galarza agreed to only charge Berry $2,000. Berry said "O.K." and that he would be ready in one hour. Based upon my knowledge of the investigation, the CS was referring that TFO Galarza only wanted $2,000, instead of the $4,000 that the CS and Berry had previously agreed to, to install the concealed compartment in the Toyota Sienna.

15. On October 26, 2012, the CS met with Berry at the Sugar House Casino parking lot, located at 1001 N. Delaware Avenue, Philadelphia, PA. Law enforcement officers observed

Berry arrive in a blue 2004 Toyota Sienna (the "Toyota Sienna"). Berry gave the keys of the Toyota Sienna to the CS along with $1,920 in cash. The CS then called TFO Galarza and gave the telephone to Berry. TFO Galarza asked Berry if the CS received the Toyota Sienna. Berry replied yes. TFO Galarza told Berry "you pay two, the family pay two." Based upon my training, experience, and involvement in the investigation, I believe this to mean that Berry owed the CS $2,000 to install the concealed compartment in the Toyota Sienna. Berry replied "no problem." TFO Galarza told Berry "Teacher, my go-go girls when they ready are you ready?" Berry "yeah I'll be ready with you." Based upon my training, experience, and involvement in the investigation, I believe that TFO Galarza used the code words "go-go girls" to mean five kilograms of cocaine.

16.   After the telephone call with TFO Galarza, the CS asked Berry "are you going to take five from Al?" Berry replied, "he said when he's ready. Let me see what's up and I'll let you know." Based upon my training, experience, and involvement in the investigation, I believe that Berry planned to purchase five kilograms of cocaine from TFO Galarza.

17.   The CS departed the meeting in the Toyota Sienna. After this meeting, DEA agents followed the CS to a predetermined location in Philadelphia, PA and took custody of the Toyota Sienna from the CS. DEA Agents then installed a concealed compartment in the center dashboard of the Toyota Sienna. The concealed compartment was also equipped to surreptitiously and electronically alert law enforcement when it was opened and closed. Agents then formulated plans to install a GPS tracking device on the Toyota Sienna upon issuance of a court-authorized warrant, then return the vehicle to Berry.

18.   On November 13, 2012, the CS met with Berry at the Sugar House Casino parking lot, located at 1001 N. Delaware Avenue, Philadelphia, PA. Berry asked the CS "what's going on with his thing?" The CS replied "He's got work with the white." Based upon my training, experience, and involvement in the investigation, I believe Berry asked if TFO Galarza

7

had kilograms of cocaine and the CS replied yes. Berry wanted to know what was next. The CS told Berry that they are waiting for the concealed compartment to be installed in the Toyota Sienna. The CS told Berry that the hurricane (referring to Hurricane Sandy) delayed the installation of the concealed compartment in the Toyota Sienna. The CS told Berry that he/she didn't know if "it's going to be convenient." Berry asked the CS what he/she meant by "convenient. The CS replied "in the white, in the white girls." Your affiant understood the white girls to mean kilograms of cocaine. The CS continued "the work is there and the price is great. I think it's going to be better for you with the white than the green." Based upon my training, experience, and involvement in the investigation, I believe that the CS was explaining to Berry that it was easier for Berry to purchase kilograms of cocaine than pounds of marijuana. The CS added "with one kilo or two kilos...you can get ten grand, fifteen grand out of nowhere...without breaking it out." Based upon my training, experience, and involvement in the investigation, I believe that the CS stated that Berry could make $10,000 to $15,000 profit by distributing one or two kilograms of cocaine.

19. The CS told Berry that he could increase his profit margin by having someone "press it out" and "get two out of one." Based upon my training, experience, and involvement in the investigation, I believe that the CS told Berry that he could add diluents to the cocaine to increase the yield. The CS added "you get it for twenty-five and you get a person come an on thirty-eight. You can sell it thirty-five, thirty-eight." Based upon my training, experience, and involvement in the investigation, I believe that the CS told Berry that he could purchase a kilogram of cocaine for $25,000 per kilogram and then sell it for $35,000 to $38,000 per kilogram.

20. Berry asked the CS "How much money do I have to have to get the thing moving?" In reply, the CS asked Berry "With the white?" Berry replied "yeah." The CS stated "probably five or ten." Berry asked the CS "I have to pay for the five I'm taking right?" The CS

8

replied that he/she didn't know and that Berry had to ask TFO Galarza. Based upon my training, experience, and involvement in the investigation, I believe that Berry wanted to know how much money was required to purchase kilogram quantities of cocaine and the CS replied that Berry had to purchase five to 10 kilograms of cocaine. Berry asked the CS "what if I told him that I only had one hundred thousand to spend with you for the first time?" The CS replied that he/she believed it would be fine.

21. Berry told the CS that he had "a guy who wants a couple of them right now." Berry asked the CS if could get "a couple of them" if he had "somebody wanting them?" Berry continued "what if I called and said I need two of them right now?" Based upon my training, experience, and involvement in the investigation, I believe that Berry had a customer who wanted to immediately purchase two kilograms of cocaine and wanted to know if TFO Galarza would distribute the cocaine to him. The CS replied "he wouldn't go for two."

22. On December 11, 2012, the Honorable M. Faith Angell, United States Magistrate Judge for the Eastern District of Pennsylvania, issued a warrant authorizing the installation and use of an electronic tracking device on the Toyota Sienna for 45 days. The device was first installed on the Toyota Sienna on December 12, 2012, and monitoring began immediately upon installation.

23. On December 12, 2012, TFO Galarza and the CS met with Berry in a public parking lot located at 100 Spring Garden Street, Philadelphia, PA. During this meeting, TFO Galarza and the CS gave Berry the Toyota Sienna and showed him how to operate the Toyota Sienna's concealed compartment. TFO Galarza also provided Berry with written instructions on how to operate the concealed compartment. Berry then operated the concealed compartment several times.

24. After instructing and showing Berry how to operate the concealed compartment, TFO Galarza spoke to Berry in Spanish. The CS translated the Spanish to English to Berry.

9

Through the CS, TFO Galarza told Berry that he had wanted to install the concealed compartment in the side doors of the Toyota Sienna, but could not do so because of the door's mechanisms. TFO Galarza also told Berry that he didn't want to install the concealed compartment in the back or in the vehicle's airbag compartments because the police often search those areas. In response, Berry said to TFO Galarza and the CS that "It looks perfect," referring to the hidden compartment.

25. Berry said "As soon as we, I get moving." TFO Galarza told Berry in English "When my girl come I call you." Your affiant understood this to mean that TFO Galarza would call Berry when a shipment of cocaine arrived. Berry replied "Alright, no problem. How much money I'm I going to have to start jumping out now like." The CS translated for TFO Galarza and then asked Berry "How much you want to take?" Berry replied "I'm probably going to have a hundred gees is that good enough?" Your affiant understood this to mean that Berry had $100,000 to purchase cocaine. The CS translated for TFO Galarza and answered Berry "When the girls come and if you got that hundred and you're ready he'll, he'll put one more just on credit you know. He'll give you the number before, but he'll put one more for credit." Berry replied "no problem, no problem." SA Gordon understood this to mean that TFO Galarza will distribute a total of five kilograms of cocaine to Berry. Finally, TFO Galarza asked Berry where he lived and Berry responded that he lived off Street Road near Parx Casino. Berry then left the meeting in the Toyota Sienna.

26. DEA Agents tracked the Toyota Sienna over the next 45 days. Through comparing tracking reports and physical surveillance, DEA Agents observed the Toyota Sienna travel to several areas in in the greater Philadelphia metropolitan area in a suspicious manner. The Toyota Sienna typically stopped at a location for short periods of time, ranging from two to 15 minutes, and then departed. For instance, on December 21, 2012, the Toyota Sienna stopped three times, ranging from 5 minutes to 14 minutes each time. The next stop, on the same day,

lasted over 9 minutes; during that 9-minute stop, agents were alerted that the concealed compartment was opened and closed four successive times. After the concealed compartment was accessed, the tracking data showed that the Toyota Sienna then made three successive stops, lasting from 6 minutes to 9 minutes.

27. In my training and experience, it is common for drug dealers to keep their illegal drugs and proceeds from the sale of these drugs not only in their residences or vehicles, but also other locations that they control, which are commonly referred to as "stash houses." Though the locations where the Toyota Sienna opened and closed the concealed compartment are not in known high-crime areas, based upon my training, experience, and involvement in the investigation, I know it is common for drug trafficking organizations to maintain stash houses in low-crime residential areas to avoid drawing the attention of law enforcement.

28. Reviewing the tracking reports, agents observed that the Toyota Sienna often made furtive driving maneuvers, such as travelling around the block several times and making short and frequent stops, prior to and immediately after the concealed compartment was opened and closed. I know from my prior experience and training that drug traffickers commonly use evasive driving maneuvers to avoid detection by law enforcement. For example, on December 21, 2012, the Toyota Sienna made three short stops. At approximately 12:02 p.m., the Toyota Sienna stopped for approximately four minutes. The location this stop is near the general area where the Toyota Sienna opened and closed the concealed compartment. After this stop, the Toyota Sienna made several evasive driving maneuvers and then stopped at approximately 12:09 p.m. (GMT). At this stop, the Toyota Sienna opened and closed the concealed compartment four successive times. Your affiant believes that the Toyota Sienna conducted these evasive driving maneuvers to evade potential law enforcement officers from identifying stash locations.

29. On December 21, 2012, DEA Agents received an alert that the concealed compartment in the Toyota Sienna was opened and then immediately closed four successive

11

times from approximately 7:12 a.m. to 7:15 a.m. near 909 Gilham Street, Philadelphia, PA. According to tracking reports, the Toyota Sienna arrived at or near 909 Gilham Street, Philadelphia, PA at approximately 7:09 a.m. and remained at the location for over nine minutes.

30. On December 27, 2012, DEA Agents received an alert that the concealed compartment in the Toyota Sienna was opened and immediately closed at approximately 7:03 p.m. The Toyota Sienna opened and closed the concealed compartment near 909 Gilham Street, Philadelphia, PA. According to tracking reports, the Toyota Sienna arrived at or near 909 Gilham Street, Philadelphia, PA at approximately 6:50 p.m. on December 27, 2012 and remained at the location for over 32 minutes.

31. Tracking and stoppage reports revealed that the Toyota Sienna made numerous and subsequent stops near 909 Gilham Street, Philadelphia, PA from December 22, 2012, to December 27, 2012. These stops lasted from seven minutes to over two and half hours. Moreover, based on the tracking reports, the route that the Toyota Sienna travelled to arrive at these locations was suspicious and appeared that the Toyota Sienna made furtive maneuvers to avoid detection from law enforcement.

32. During most of the period in which agents were monitoring the Toyota Sienna, it was parked in the vicinity of 2500 Knights Road, Philadelphia, PA, which agents believe is where Berry resides. According to the tracker reports, the Toyota Sienna was often parked near this area for up to 10 hours a day. Moreover, Berry had told the CS and TFO Galarza that he resides near Parx Casino in Bensalem, PA, which is located a mere five minutes away from 2500 Knights Road. As a result, your affiant believes that Berry has access to the Toyota Sienna.

33. On or about January 4, 2013, the CS received an incoming text message from Berry. Berry wrote "Hey bro jus' touchin' base with." The CS replied "Thank u for touchin' base brother, hope u ok. I'm good vacation was great, just waiting for my girlfriends to get here." Your affiant understood this to mean that the CS was informing Berry that the CS was waiting

for the shipment of cocaine to arrive.

34. On or about January 9, 2013, the CS received an incoming text message from Berry. Berry wrote "Wats up bro." The CS replied "No good bro, still getting a hardtime to bring girl from the island, immigration sucks, bout u brother." Your affiant understood this to mean that the CS was informing Berry that the CS had problems attempting to smuggle the kilograms of cocaine from the Dominican Republic to the United States. On January 19, 2013, Berry replied "I'm just here bro."

35. On January 25, 2013, the warrant authorizing the installation and use of the electronic tracking device on the Toyota Sienna expired and agents terminated monitoring of the tracking device.

36. From on or about February 7, 2013, to February 11, 2013, the CS and Berry exchanged a series of text messages. The CS and Berry agreed to meet in Philadelphia, PA on the afternoon of February 11, 2013, specifically near Darling's Diner, which is located at the corners of Germantown Avenue, and 2nd Street, Philadelphia, PA. The CS then met Berry at the agreed-upon location. At the meeting on February 11, 2013, the CS told Berry that he (Berry) could have received the shipment of cocaine last week, but didn't answer his telephone. Berry replied that he couldn't wait and "had to do something else." Your affiant understood this to mean Berry couldn't wait for the CS and TFO Galarza to distribute kilograms of cocaine to him so he purchased drugs from another drug trafficker. The CS told Berry that the price per kilogram increased to $30,000. Berry replied that "thirty was high" and that he was "low on the cash since I sent some of the cash out. You understand?" Your affiant understood this to mean that Berry used some of the $100,000, which he had told the CS and TFO Galarza on December 12, 2012, that he intended to use to purchase five kilograms of cocaine from the CS and TFO Galarza, and used it to purchase drugs from another drug trafficker.

37. The CS told Berry that he could make "eight to ten grand clear out of one." Your

13

affiant understood this to mean that Berry could earn $8,000 to $10,000 profit by distributing one kilogram of cocaine for $38,000 to $40,000 since the purchase price was only $30,000 per kilogram. The CS told Berry how the transaction will occur. The CS said that they would all meet one of TFO Galarza's "businesses" wherein "he will put the girls in the calvo." Your affiant understood this to mean that TFO Galarza will place the kilograms of cocaine into the concealed compartment in the Toyota Sienna.

38. The CS asked Berry "how is that thing working?" Your affiant understood this to mean that the CS wanted to know if the concealed compartment was working in the Toyota Sienna. Berry replied "I opened it a couple of times...a little part of it came up." Your affiant understood this to mean that a portion of the plastic covering for the concealed compartment in the Toyota Sienna was misaligned. The CS told Berry to be careful when "closing it" and to "put the money in there so you won't be carrying it on you." Berry said "right." Your affiant understood this to mean that the CS wanted Berry to be careful when using the concealed compartment in the Toyota Sienna since Berry was going to place the money in it.

39. Berry told the CS that he "had sixty grand." He continued "I had to go out of town for a couple of days." The CS asked Berry if he was "getting some stuff from the west?" Your affiant understood this to mean that the CS was asking Berry if he purchased marijuana from a source of supply in Texas. Berry replied "yeah, sometimes."

40. The CS and Berry then discussed how many days Berry needed to pay the balance of the money since he only had $60,000 and the agreed purchase price for the cocaine was for $100,000. Berry told the CS that he needed "no more than two days" to pay the balance. Berry repeated that he had "about sixty grand. I told you I sent some money to get invested in other places."

41. The CS then called TFO Galarza. The CS gave the phone to Berry. TFO Galarza asked Berry if he would be "ready on Wednesday or Thursday." Berry said "not quite" and

14

added that his "receipts" weren't "completed." Berry continued "I made a little an investment somewhere. I'm waiting for the receipts to come my way." Your affiant understood this to mean that Berry used some of the $100,000 to purchase drugs, possibly marijuana, and was waiting for the proceeds from those drug trafficking activities.

42. After the telephone phone call with TFO Galarza, the CS and Berry again discussed the use of the concealed compartment. Berry asked the CS to "look at the stash." Your affiant understood "stash" to mean the concealed compartment in the Toyota Sienna. The CS told Berry that "it was fine" and didn't remember the exact sequence to open it. Berry said he had "an idea" to open it. The CS asked Berry if he "had the paper." Your affiant understood this to mean if Berry had the instructions to open the concealed compartment. Berry said no, but then stated that he "looked at it a couple of times." He added "I know how to do it." The CS and Berry then discussed the sequence of events they had to perform to open the concealed compartment in the Toyota Sienna. The CS told Berry to ensure he knows how to operate the concealed compartment so "you can put the money in there." Berry replied "yeah."

43. TFO Galarza called the CS back. TFO Galarza told Berry to listen to the CS. TFO Galarza and the CS then spoke in Spanish. After the telephone call with TFO Galarza, the CS told Berry that TFO Galarza agreed to distribute three kilograms of cocaine to Berry for $60,000 and one kilogram would be provided on credit. The CS told Berry to be prepared to receive the kilograms of cocaine on Wednesday or Thursday. Berry said "I pay back in two days." Your affiant understood this to mean that Berry would pay the balance of the debt, that is $30,000, in two days. Berry then agreed to meet the CS and TFO Galarza either on Wednesday or Thursday, February 13 or 14, 2013, respectively, and bring $60,000 to receive the three kilograms of cocaine from them.

44. On February 14, 2013, arrangements were made for Berry to meet the CS, TFO Galarza, and another cooperating source ("CS-2"), working at the direction of law enforcement,

at the parking lot of Darling's Diner, located at 1033 N. 2nd Street, Philadelphia, PA, for the purpose of distributing three kilograms of cocaine to Berry in exchange for $60,000 in cash. At approximately 2:30 p.m., Berry arrived at the location driving the Toyota Sienna. He was alone in the vehicle. He told TFO Galarza that he only had "50", which Your Affiant understood to mean that Berry only had $50,000 of the $60,000 that he had agreed to bring.

45.   The CS and CS#2 walked to Berry's vehicle and confirmed that there was a large amount of cash in a black plastic bag in the vehicle. Berry, the CS, and CS#2 then walked to TFO Galarza who was in his car. TFO Galarza instructed Berry to open the trunk of TFO Galarza's car and take out a duffle bag from the trunk. When Berry took possession of the bag, which contained three kilograms of sham cocaine, TFO Galarza told him to take it to the Sienna, put the cocaine in the hidden compartment, and return with the with the money. Berry agreed and took the duffle bag and walked towards his vehicle. As he opened up the door to the Sienna, he was arrested by law enforcement.

46.   WHEREFORE, based upon my training and experience and my knowledge of this investigation, I have probable cause to believe, and do so believe, that on February 14, 2013, in the Eastern District of Pennsylvania, defendant Basil Berry violated Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B) and 846 (attempted possession and possession with intent to

16

distribute 500 grams or more of cocaine) and that a warrant should be issued for his arrest.

Sworn to before me this 15th day

of February, 2013.

_Lynne A. Sitarski_
HONORABLE LYNNE A. SITARSKI
United States Magistrate Judge

_Matt Gordon_
Matt Gordon
Special Agent
Drug Enforcement Administration

17